Littleton, Judge,
delivered the opinion of the court:
The Yang Construction Company, herein referred to as the contractor, entered into a unit-price contract with defendant dated November 9, 1932, for the construction of a lock and dam across the Allegheny River about five miles from Pittsburgh, Pennsylvania. Eight items involving a powerhouse, lock machinery, and other machinery and equipment were lump-sum items. All others were unit-price items. The estimated contract price based on these lump-sum items and other estimated quantities for the unit-price items was $1,190,251.48. The contractor’s bid, which was accepted, was submitted October 14, and prior to October 24, 1932, it was advised by defendant that the contract had been awarded to it. The contractor, with the consent of defendant, began construction operations under the specifications and drawings October 24,1932, and, subsequent to November 9, signed the formal contract and furnished a performance bond on which plaintiff was surety. The contract was signed and the bond approved by defendant December 6, and the contractor received formal notice to proceed on the following day, December 7, 1932. This fixed the completion date, for a period of 450 days, as March 1st, 1934.
While the contractor was continuing with the work a receivership proceeding was filed against it July 11,1934, and, on the same date, the U. S. District Court for the Western District of Pennsylvania appointed receivers for the contractor. Under authority given by this decree the receivers on July 13 elected to disaffirm the contract between The Vang Construction Company and the defendant and notified the contracting officer of their refusal to accept the contract and proceed with its completion. Thereupon, and on the same day, the plaintiff, as surety on the contractor’s performance bond, entered into a supplemental contract with the Govern *371 ment and tbe receivers of Tbe Vang Construction Company, which contract provided that the surety would take over and complete the work under and in accordance with the original contract, receive semi-monthly payments from the Government for all earned estimates for work performed by it under the original contract, and “that in the event the Fidelity and Deposit Company of Maryland sustains a loss in the completion of the work it shall receive payment to the extent thereof from any amounts earned by The Vang Construction Company not heretofore paid to the contractor, if any, after all claims of the United States against the contractor have been satisfied.”
In completing the contract work plaintiff used substantially the contractor’s organization, including its employees and laborers, and expended $138,301.38 for such completion. In addition plaintiff paid $156,145.56 for material and labor claims against the contractor which had accrued at the time of appointment of the receivers. These two amounts total $294,446.94.
During and upon completion plaintiff received from the Government progress payments for contract work performed by it in amounts totaling $78,270.96. This amount included $15,114.72 allowed but not paid to the contractor on progress estimate no. 23. On the final payment voucher plaintiff also received $88,671.80 representing the total of the retained percentages due after deduction by defendant of $16,042.92 for liquidated damages for 53.5 days’ delay. The total of the amount so paid to plaintiff by defendant was $166,942.67. The sum of $50,000 of the retained percentage of $88,671.80 above-mentioned represents amounts withheld by defendant from prior progress payments earned by and paid to the contractor. In addition to the amount of $166,942.67 received from the Government upon completion of work, plaintiff also received from the contractor $98,216. The total of the amounts which plaintiff received from the Government and the contractor was $265,068.76, and inasmuch as plaintiff had paid out for completion of the contract work and on material and labor claims against the contractor a total of $294,446.94, its loss was $29,378.18. The total paid plaintiff *372 by defendant under the terms of the original contract and the supplemental agreement of July 13, 1934, was $28,641.29 in excess of the amount expended by plaintiff in completing the work. However, under the terms of the performance bond and the supplemental agreement of July 13, to which the re-, ceivers were also parties, plaintiff upon completion of the work in October 1934 became subrogated to all rights of the contractor and the receivers under the original contract. The supplemental agreement did not amount to an assignment by the receivers of a claim against the Government within the meaning of sec. 3477 of the Devised Statutes, and on November 4,1936, prior to institution of this suit, the receivers, with approval of the court, distributed and returned to The Yang Construction Company all assets of every kind then remaining in their hands, and they were discharged. This action of the receivers included the return to the contractor of any claim which they, as receivers for the company, or the contractor may have had against the United States, under the contract of November 9, 1932.
The first item of the claim is $8,143.88 for alleged excess cost of reconstructing the first of two concrete caissons which the contractor, with the consent of defendant, elected to use as the foundation for the abutment of the dam. The reconstruction cost was $6,013.34 (finding 19). The proof does not show that rebuilding of this caisson delayed the final completion of the contract work.
The specifications and original plans required the contractor to build a cofferdam around the area of the foundation for the abutment and, after pumping the area dry, to construct the concrete foundation. However the contractor proposed the caisson method and asked permission to use it. This permission was granted by change order no. 1 which authorized the contractor at its own expense and risk (finding 8) to use two caissons, each 75 feet long, 28 feet wide, and 30 feet high, with walls and three partitions 8 feet thick above the working chamber. The change order specifically provided that the contractor would be responsible for the construction and the sinking of the caissons and that “any *373 caisson which is damaged before landing and seating on bed rock, or is otherwise unsuitable for serving its purpose as a foundation for the abutment wall, will be removed and replaced or repaired to the satisfaction of the contracting officer.” The provisions of the specifications relating to concrete were made applicable to the caissons (finding 11). The work of constructing the two caissons, known as the downstream and upsteam caissons, proceeded simultaneously, but operations on the first, or downstream, caisson were carried on ahead of those for the other one: the two caissons were built adjacent to each other. The pouring of concrete for the downstream caisson was commenced November 24 and was completed November 29, 1932; and that for the upstream caisson was commenced November 30 and was completed December 2, 1932. The same concrete mix was used in both caissons and such concrete was poured under the same conditions and the same instructions of defendant’s inspector. The forms were removed from the first caisson December 3, 1932, and it was allowed to cure until December 7 when the work of removing blocking, or cribbing, and excavating for the sinking of this caisson was commenced. , Two hours and twenty minutes after this work was commenced one wall of the caisson cracked from the bottom upward near its center, and as the work of removing, blocking and excavating continued the crack widened and extended upward to such extent that defendant’s inspector condemned the caisson and ordered its demolition and reconstruction. The contractor demolished and reconstructed the caisson without protest or claim to the contracting officer.
It is now claimed on behalf of the contractor that the breaking of the caisson was caused by the unauthorized and arbitrary action of defendant’s inspector in requiring the contractor to use unworkable concrete that was too dry to permit it to bond properly with reinforcing rods in the cutting edge and walls of the caisson, but this claim is not sustained by the evidence. The inspector’s actions and instructions were taken and given in an honest effort to exact *374 compliance with the specifications so as to provide concrete of the required strength. He did not act arbitrarily, and the instructions given by him did not violate the specifications. The mix to be used in the concrete was fixed by the specifications (finding 11) and, prior to pouring, defendant’s inspector made tests of the concrete for the purpose of ascertaining that it had at least the minimum strength required by the specifications. All concrete that went into the caissons was actually stronger than the minimum requirements. Although the contractor protested to the inspector from the beginning of the pouring of the first caisson that insufficient water was being used in the concrete mix to make it workable, the proof fails to establish that the concrete was unworkable within the meaning of the specifications. So far as the concrete was concerned, the contractor’s difficulty was due to the fact that the concrete was hauled about five miles and was not properly and thoroughly worked and tamped as it was poured. Par. 5-11 of the specifications provided that “An increase in the maximum water content, based only on the requirements of any admixture, will not be permitted unless comparative tests under job conditions show conclusively that the increase in water content does not result in a decrease in concrete strength.” Moreover, by failing to protest to the contracting officer, as required in such cases by pars. 1-22 and 1-25 of the specifications, the contractor accepted the instructions and rulings of the inspector and cannot now complain. The purpose of those provisions was to place upon the contractor the responsibility of bringing before the contracting officer for appropriate action any instruction or ruling of the inspector which the contractor might think erroneous in order that the contractor, as well as the Government, might not be put to unnecessary expense.
If it be assumed, however, that the inspector in his instructions exceeded his authority under the specification provisions relating to concrete and that plaintiff is not barred by its failure to protest to the contracting officer, the contractor still cannot recover on this claim for the reason that the far greater weight of evidence shows that the break in the caisson was due not to the weakness of the concrete but to the manner *375 in which the contractor removed the blocking from under the caisson and made excess excavation in the center portion thereof, thereby leaving the center portion of the sidewalls of the caisson without adequate support. The second caisson was exactly like the first. The same concrete mix was used and poured under similar conditions. However, the contractor used more care in properly sinking this caisson and no trouble was experienced with it.
The second item of the claim is $26,146.32 for alleged loss of profit and excess cost of constructing the third section of the cofferdam for the final section of the dam across the river where it joined the navigation lock. The contract required the concrete navigation lock and all of its machinery and equipment to be completed and opened for the flow of water and for navigation purposes before the cofferdam for the final section of the dam was constructed. The claim is based on alleged excess cost of the third section of the cofferdam over the cost of the adjoining second section previously constructed. The proof does not show that such excess cost was more than $12,255.36 (finding 36).
The basis of this claim is that defendant by misrepresentations in the specifications and drawings as to subsurface conditions at the lock site delayed the contractor in completion of the lock, thereby throwing the work of constructing the third cofferdam section into winter weather and a period of high water which rendered such construction more difficult and expensive than the contractor had anticipated, or was required to expect.
The proof conclusively shows that defendant made no such misrepresentation as to subsurface conditions at the lock site as would render it liable for damages as for a breach of contract for any additional time required on account of the subsurface conditions actually encountered. This was a unit-price contract as to all excavation and concrete work that might be necessary or required. The contractor was given extensions of time for all extra work due to changes, unforeseen conditions, and various other causes, and was paid the contract unit prices for all work performed. Eock was encountered by the contractor above the rock elevation indi *376 cated on the original drawing and when the elevation for the foundation as originally shown was reached on January 12, 1933, it was determined that excavation would have to be extended due to unstable conditions of the rock at that elevation. Par. 3-01 of the specification provided under the heading “Excavation, Foundations,” that “From surveys and borings made at the site it is assumed that conditions will be approximately as indicated on the drawings, but the Government does not guarantee the nature of the material to be encountered in the river-bed, the correctness of depth to rock as assumed or shown on the drawings, or the depth to which it may be necessary to excavate * * *. Bidders are advised to visit the site, to examine the samples, and to judge for themselves the character of the materials to be encountered.” Par. 3-02 provided that “The character and positions of the proposed foundations for the different parts of the work are shown on the drawings. The Government, however, reserves the right to increase the depth, width, or strength of foundation * * * if in the opinion of the contracting officer, conditions require such modification.”
The contracting officer gave the contractor an extension of time of 30.4 days in accordance with change order no. 5 (finding 24) for all work connected with or incidental to additional rock excavation, including such excavation and other work as made necessary by reason of the extension of foundations, all of which work was included in the terms of the change order and the formula set forth therein for determining additional time to be allowed. The proof does not show that this extension of time was inadequate to cover the time needed and used for the additional work covered thereby. Moreover, when the contractor protested June 18, 1933 that change order no. 5 of January 24 did not include such time as might be necessary in connection with concreting operations for the extended foundation and the contracting officer held that the formula set forth in the change order did include such work, the contractor did not appeal to the head of the department until six months after the contracting officer first denied its claim for additional time.
*377 The correctness of the decision of the contracting officer allowing this extension of 30.4 days is shown by the following facts: On January 12,1933 the contractor had excavated all rock to the levels shown for the foundations and had commenced channeling for footings, etc. Because it had originally commenced construction operations ahead of its progress schedule, which it was required to file with its bid, the contractor was three weeks ahead of schedule on January 12, 1933. On account of events not related to the work incident to additional rock excavation and extension of foundation, which occurred prior to January 21,1934 when the lock was completed, the contractor received various extensions of time which, with the 30.4 days granted under change order 5, amounted to 104.9 days (finding 33). After. allowing for these extensions the contractor, on January 21, 1934, when it completed the lock, was still ahead of its schedule approximately three weeks.
For the reasons stated we hold that defendant did not breach its contract in relation to the navigation lock structure by preventing the contractor from completing the same by October 25,1933, as it claims. It follows, therefore, that defendant is not liable for any excess costs that may have been sustained by the contractor or plaintiff in construction of the third and final section of the cofferdam for the river dam.
The last item of the claim is for $16,042.92, liquidated damages charged and deducted by defendant for 53.5 days’ delay. The proof does not establish that defendant was responsible for this delay in completion of the entire work by the contractor and plaintiff. No protest or appeal .was taken, as required.
Plaintiff is not entitled to recover and its petition is dismissed. It is so ordered.
Maddest, Judge; Whitaker, Judge, and Whaley, Chief Justice, concur.
Jones, Judge, took no part in the decision of this case.